1    **GLANCY BINKOW & GOLDBERG LLP**
     LIONEL Z. GLANCY (#134180)
2    PETER A. BINKOW (#173848)
3    MICHAEL GOLDBERG (#188669)
     ROBERT V. PRONGAY (#270796)
4    1925 Century Park East, Suite 2100
5    Los Angeles, California 90067
     Telephone: (310) 201-9150
6    Facsimile:  (310) 201-9160

7
8    *Attorneys for Plaintiff*

9    [Additional Counsel on Signature Page]

10                    UNITED STATES DISTRICT COURT
11                    CENTRAL DISTRICT OF CALIFORNIA

12
13   JEREMY KORZEN, Individually and On        Case No. CV 13-04724-SVW-SS
     Behalf of All Others Similarly Situated,
14                                             **CONSOLIDATED AMENDED**
15                          Plaintiff,         **CLASS ACTION COMPLAINT**
                                               **FOR VIOLATIONS OF THE**
16                   v.                        **FEDERAL SECURITIES LAWS**

17
18   TETRA TECH, INC., DAN L.
     BATRACK, and STEVEN M.
19   BURDICK,                                  Hon. Stephen V. Wilson

20
21                          Defendants.        **DEMAND FOR JURY TRIAL**

22
23
24
25
26
27
28

Lead Plaintiff William Daniel Hudock ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tetra Tech, Inc. ("Tetra" or the "Company"), interviews with former employees of the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Tetra securities between May 3, 2012 and June 18, 2013, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 promulgated thereunder against the Company and certain of its top officials and/or directors.

2.     Tetra is a publicly traded company headquartered in Pasadena, California. Tetra was founded in 1966 to provide engineering services related to waterways, harbors and coastal area.  Tetra went public in 1991, and markets itself as a leading provider of consulting, engineering, program management, construction management, construction and technical services that focuses on addressing fundamental needs for water, the environment, energy, infrastructure and natural resources.

3.     The fiscal year for Tetra begins on October 1 and ends on September 30.

4.     The Company derives a significant portion of its revenues from federal, state and local governments and agencies, including the U.S. Department of Homeland Security, the U.S. Department of Defense, the U.S. Environmental Protection Agency, the Federal Aviation Administration, the U.S. Postal Service, and provincial governments in Canada, as well as the States of California, Massachusetts and New York.  Tetra also serves domestic private sector clients such as Bechtel Power Corp., ConocoPhillips Co., and Ford Motor Co.   Tetra's international commercial clients, which are predominately located in Canada, include primarily mining and oil companies.  Government and international customers comprise 73% of Tetra's total business, and form its core operations.  The Company has grown dramatically since the early 1990s through a series of acquisitions. Currently, Tetra and its subsidiaries have over 110 offices worldwide and approximately 14,000 employees worldwide, located

primarily in North America. The financial results of the companies Tetra acquired were included in the consolidated financial statements that Tetra reported to investors.

5.     Tetra's reported year-over-year growth, however, was a chimera. To raise funds from investors and to sustain its stock price, Tetra created the illusion of sustained growth by accounting for ultimately uncollectible cost overruns to its federal contracts as revenue and concealing serious problems in its Eastern Canadian and mining operations. As a result, throughout the Class Period, Tetra's financial statements: (a) omitted that its assumptions regarding the collectability of cost overruns were not reasonable; (b) materially overstated accounts receivable; (c) materially underreserved the allowance for doubtful accounts; and (d) omitted the ongoing collapse of its Eastern Canadian operations and its likely financial impact on the Company.

6.     Tetra's services are performed under three principal types of contracts with their clients: fixed-price, time-and-materials, and cost-plus. Under fixed-price contracts, which comprised 40.2% of Tetra's 2012 revenue, the client agrees to pay a specified price for Tetra's performance of the entire contract or a specified portion of the contract.

7.     Upon completion of a particular task, the Company will bill its clients based on the previously agreed sum. Once billed, these amounts are included in the Company's billed accounts receivable, which represents amounts billed to clients that

have not yet been collected.  Unbilled accounts receivable represent revenue recognized but not yet billed pursuant to contract terms or billed after the period end date.

8.     Under unbilled accounts receivable, Tetra included claims and equitable determinations by its clients on fixed-price contracts.  These contracts provide for price redetermination, primarily with U.S. federal government agencies, whereby previously billed work may require adjustments to prior billing invoices and/or further work by the Company without further compensation.  Simply put, the Company must either absorb the cost of overruns or obtain the client's agreement that it shoulder all or some of the costs that Tetra believes could not have been reasonably foreseen.  General Accepted Accounting Principles ("GAAP") required that these overruns not be booked as revenue or, at minimum, that Tetra accrue proper loss contingencies.

9.     In its quarterly report filed with the SEC on May 3, 2012, the start of the Class Period, the Company stated, in conjunction with booking $330 million in unbilled receivables, that:

> Most of our unbilled receivables at March 31, 2013 are expected to be billed and collected within 12 months. Unbilled accounts receivable at March 31, 2013 and September 30, 2012 include approximately $36 million and $21 million, respectively, related to claims and requests for equitable adjustment on contracts that provide for price redetermination, primarily with U.S. federal government agencies. These amounts are management's estimate of the most probable amount to be realized upon the conclusion of the claims settlement process. *We regularly evaluate these claim amounts and record appropriate adjustments to operating earnings when collectability is deemed to have changed. No losses were*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
4

*recognized related to the collectability of claims during the second quarter and first half of fiscal 2013 and 2012.* Contract retentions represent amounts withheld by clients until certain conditions are met or the project is completed, which may be several months or years. *The allowance for doubtful accounts is determined based on a review of client-specific accounts, and contract issues resulting from current events and economic circumstances.* Billings in excess of costs on uncompleted contracts represent the amount of cash collected from clients and billings to clients on contracts in advance of revenue recognized. The majority of billings in excess of costs on uncompleted contracts will be earned within 12 months. The non-current billings in excess of costs on uncompleted contracts are reported as part of our "Other long-term liabilities" on our condensed consolidated balance sheets.  [Italics added]

10.    Despite these ongoing duties, the Company improperly booked cost overruns as revenue throughout the Class Period and utterly failed to take necessary charges to its accounts receivable on projects that were subject to claims and equitable charges by federal and state government clients.

11.    Additionally, throughout the Class Period, the Company was subject to an overall decline in the Eastern Canadian mining and oil industry due to issues that allegedly included poor economic conditions, including budget deficits, reduced customer spending, and an on-going government investigation into political corruption in Quebec.  Notwithstanding the Company's knowledge of the downturn in the Eastern Canadian market, the Company failed to inform investors of the extent to which it would adversely affect Tetra.

12.     Indeed, on May 2, 2013, Tetra held a conference call for analysts and investors regarding the Company's 2013 second quarter earnings. During the call, Defendant Dan L. Batrack, Tetra's Chairman and Chief Executive Officer, noted that the mining industry, especially in the regional markets in Eastern Canada, was experiencing significant challenges.  Yet, despite these challenges, Defendant Batrack forecast net revenue of $525 million to $575 million, and diluted earnings per share of $0.32 to $0.42, for the third quarter of 2013.

13.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) claims by customers and cost overruns created an acute risk that the Company would need to take an earnings charge; and, (ii) decreasing demand for the Company's services would lead to project closures.

14.     On June 18, 2013, the Company shocked investors by issuing a press release revising its prior guidance for the third quarter of 2013 to a loss of $0.30 to $0.50 per share, and disclosing:

> Tetra Tech plans to incur restructuring costs associated with its Eastern Canadian and mining operations in the third quarter 2013. These costs are now estimated to be approximately $50 million in the third quarter, approximately $40 million of which are non-recurring. This increase is principally related to increased severance and office closure costs to downsize these operations due to reduced project demand caused by poor economic conditions. Approximately two-thirds of these costs

are associated with Eastern Canada, and approximately one-third are associated with mining operations. Based upon these anticipated results, Tetra Tech is performing a goodwill impairment test on its Eastern Canadian and mining operations, and will update investors on the test results in the third quarter earnings release.

In addition, Tetra Tech plans to incur charges to resolve certain project claims in its third quarter. During the quarter, Tetra Tech received adverse findings principally related to claims on four programs, and will consequently record a charge while it continues the dispute resolution processes. The claims are primarily related to change orders on lump-sum projects for certain U.S. federal and state government customers that are currently under significant budget pressure. These charges are estimated to be up to $45 million, most of which are associated with accounts receivable.

The charges will affect the revenue and profitability of all three reportable segments. In the third quarter, revenue, net of subcontractor costs, is now expected to range from $440 million to $490 million, and, based on these charges, diluted loss per share is expected to range from $0.30 to $0.50.

15.     The Company provided no prior guidance regarding the change orders on its government contracts or the steep restructuring costs associated with the Eastern Canadian segment of the Company's operations, even though both issues were known to the Company well in advance of the June 18, 2013 announcement.

16.     On this news, Tetra securities declined $3.55 per share or 13.26%, to close at $23.30 per share on June 19, 2013.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities upon the partial

public disclosures of April and June 2013, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Tetra's headquarters are located within this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff, as set forth in the Certification submitted in conjunction with his Motion for Appointment as Lead Plaintiff and Approval of Counsel (*see* Dkt. No. 15), acquired Tetra securities at artificially inflated prices during the Class Period and has been damaged thereby.

23.     Defendant Tetra is a Delaware corporation with its principal executive offices located at 3475 East Foothill Blvd., Pasadena, CA 91107.  Tetra's common stock trades on the NASDAQ under the ticker symbol "TTEK."

24.     Defendant Dan L. Batrack ("Batrack") is the Company's Chairman, Chief Executive Officer and President.

25.     Defendant Steven M. Burdick ("Burdick") is the Company's Executive Vice-President, Chief Financial Officer and Treasurer.

26.     The defendants referenced above in ¶¶ 24-25 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Tetra provides consulting, engineering, and technical services worldwide. Tetra's operations are divided into four divisions:

1)     Engineering and Consulting Services ("ECS") (38.2% of Tetra's business), which provides front-end science, consulting engineering services and project management in the areas of surface water management, solid waste management, mining, geotechnical sciences, arctic engineering, industrial processes and oil sands, and information technology;

2)     Technical Support Services ("TSS") (33.9% of Tetra's business), which provides management consulting services and strategic direction in the areas of environmental assessments/hazardous waste

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

9

management; climate change; international development; international reconstruction and stabilization; energy; oil and gas; and technical government consulting; and

     3)    Engineering and Architecture Services ("EAS") (11.8% of Tetra's business), which provides engineering and architecture design services, together with technical and program administration services for projects related to water infrastructure, transportation, and buildings and facilities; and

     4)    Remediation and Construction Management ("RCM") (22.9%), which provides construction and construction management services in the areas of environmental remediation, infrastructure development, energy, and oil and gas.

28.    Tetra bills itself as a purveyor of "integrated solutions" across water and related service lines.  Tetra's varied and large scale operations, however, also leave its overall profitability vulnerable to problems within the Company's various sectors.

29.    Defendant Batrack acknowledged this issue in the wake of the June 18, 2013 full disclosure when he sought to reassure investors that "The actions we are taking in the third quarter proactively address changes in the market and *right-size our operations to immediately return the company to its historical profitability and trend of margin improvement*[.]" (Italics added).

30.     Tetra's RCM segment, in particular, was susceptible to significant cost overruns, which accelerated in the first and second quarters of 2013.

31.     Tetra would be hired by a client to complete design of a specified project for a pre-set rate.  Where the cost of the actual project ran over the pre-set price bid by Tetra at the commencement of the project, most if not all of the subsequent cost overruns would be borne by Tetra.  If a project's cost exceeded the bid, Tetra was required to complete construction of the project at a loss.

32.     Accordingly, when a project faced a cost overrun, Tetra could attempt to recoup some or all of the overrun by submitting a request for equitable adjustment to the client(s).  However, it had no assurance that such requests would be granted.

33.     Equitable adjustments were characterized by a period of negotiation in which Tetra would seek to have the client shoulder all or some of the costs that it believed could not be reasonably foreseen.  If the client refused, the cost overruns generally fell to Tetra to cover.

34.     Tetra's ability to obtain equitable adjustments was subject not only to the whims of its partners, but was also impaired by its inability to properly generate the data needed to justify its requests due to its byzantine internal controls, which consisted of a patchwork of billing clerks and in-house accounts receivable departments, all tasked with relaying their progress in collecting their respective accounts to Tetra's Pasadena headquarters.

35.     Even though Defendants had no reasonable assurance that the requested equitable adjustments would be granted, they nonetheless booked the amounts of the requests as unbilled accounts receivable.

36.     By this accounting gimmick which treated a request for revenue as actual revenue, Defendants both avoided taking charges on cost overruns while recognizing those sums as revenue.

37.     As an initial matter, GAAP does not permit the recognition of revenue where collectability is not reasonably assured.

38.     GAAP further requires the accrual of an estimated loss from a loss contingency where, as here, the probable loss was both known and estimable.

39.     GAAP also specifies that contractors like Tetra have adequate internal controls capable of accounting for contracts subject to equitable adjustment before entering into such arrangements.

40.     Previously, Tetra's accounting was scrutinized on similar grounds.  In a 2010 letter to Tetra, the SEC warned the Company about improperly using accounts receivable to bury charges relating to the RCM segment:

> We note that you recognized a $24.2 million charge for contract losses and related receivables, which is 19.9% of fiscal year 2009 income from operations. Based on [Tetra's] disclosures … it appears that this charge may relate to your Remediation and Construction Management segment. If this is correct, this charge represents 63.4% of the Remediation and Construction Management segment's income from operations. **Given the significance of the charge to your consolidated and segment results, there is a concern that your current disclosures do not provide**

**investors with sufficient information to understand the circumstances that led to the recognition of this charge.** In future filings, please provide investors with a full understand of the specific facts and circumstances that led to the recognition of the $24.2 million charge. [Boldface added.]

*See* SEC Letter to Tetra filed Feb. 22, 2010, publicly available at: http://www.sec.gov/Archives/edgar/data/831641/000000000010009947/filename1.pdf

41.     In a responsive letter signed by Defendant Batrack, Tetra promised to provide "further qualitative analysis together with the appropriate quantitative analysis" in future filings.   Tetra also provided a supplementary analysis of the charge in question.

*See* Tetra Letter to SEC filed on Mar. 29, 2010, publicly available at http://www.sec.gov/Archives/edgar/data/831641/000110465910017044/filename1.htm

42.     During the Class Period, Tetra undertook military and construction projects in Afghanistan and southern Louisiana that resulted in significant cost overruns, and, ultimately, tens of millions of dollars in charges to the Company.   The Company knew of these cost overruns at the time because the contracts in its possession reflected the fixed prices it was entitled to receive and its expense reports and financial records reflected the amount of costs it had incurred.

43.     Although these challenges were known internally, Defendants repeatedly told investors that they were continuing to monitor the collectability of outstanding accounts and touted increasing revenues.

44.    These assurances were false and reckless because Defendants' accounting practices did not project the truth about the mounting onslaught of cost overruns, but, rather, served to mask that truth from investors.

45.    Furthermore, even as Tetra's accounts receivable increased between 2012 and 2013, Tetra's allowances for doubtful accounts did not increase proportionately as required under GAAP.

46.    In fact, it was completely uncertain that Tetra's cost overruns would ever be collected, a fact known not only to the Individual Defendants – via weekly and quarterly reports – but also known to non-executive, on-the-ground employees.

47.    As a result, by the end of the Class Period, the Company was compelled to disclose a $45 million charge associated with accounts receivable, driving share prices down sharply.

48.    Meanwhile, Tetra's Eastern Canadian and mining operations were troubled from mid-2012 on after a major client suddenly began to cancel its contracts with a Tetra division and the global mining industry began suffering a sharp downturn in the construction of new mines.

49.    Eventually, this downturn would result in the layoff of hundreds of Tetra employees, the evisceration of its Eastern Canadian and mining operations, and restructuring charges totaling approximately $50 million.

50.     To make matters worse, Tetra faced additional challenges.  For example, the Company faced layoffs of State Department-affiliated program analysts due to budget cuts at the federal level, and Tetra was reportedly "fired" from a major commercial contract with General Electric.

51.     By booking inflated revenues, improperly accounting for contingent liabilities, and minimizing the collapse an entire sector, Defendants sought to project an image of growth, even while conducting large-scale layoffs and office closings in both Tetra's governmental and mining sectors.  Moreover, Tetra reported artificially high earnings, which maintained inflated share prices during the Class Period, thus misleading investors and analysts.

52.     For example, On January 29, 2013, Rochelle Jenks published an article on the investor blog *Seeking Alpha* predicting that:

> Tetra Tech's future looks as positive as its history.  It is projecting long-term revenue growth will average 15% per year. One business driver is the demand for commodities like uranium, precious metals, potash and phosphate. The 2012 revenue from the mining industries should increase by 56% in the next 2 to 4 years. Another driver is the demand for energy and has resulted in increased activity in the oil sands and shale basins. The demand will provide attractive opportunities for Tetra Tech in the next 2 to 4 years. Tetra Tech's 2012 revenue from those industries should more than triple.

53.     In fact, Tetra's business at the time was plagued by government budget cuts, cost overruns, lost contracts, and the decline of its Eastern Canadian and mining operations.  To compensate for this, and despite Defendants' knowledge of these issues,

Tetra represented to investors a more profitable picture of its financial circumstances than actually existed.

54.    Eventually, the Company dribbled out word of its true situation on April 8, 2013, when it revealed that it anticipated weaker-than-expected operating performance during the second half of fiscal 2013, due primarily to its business in Eastern Canada.

55.    While this partial disclosure did not fully reveal the extent of the Company's misconduct – omitting material restructuring costs and charges due to cost overruns – Tetra's share price dropped by approximately $1.47, from $28.36 to $26.89, a decline of over 5%.  Over subsequent days, the stock price continued to drop, bottoming out at $24.44 on April 18, 2013.

56.    However, Tetra's share prices bounced back when the market absorbed the Company's announcement that, on or about April 15, 2013, Tetra was awarded a $17.8 million contract to perform environmental services for the privatized cleanup of the former McClellan Air Force Base in California: an April 17, 2013 write-up at the Analyst Blog at *Zacks.com* specifically noted that "[t]his contract is expected to help the company in its recovery during the second half of the year."

57.    Tetra stock soared after the announcement of the McClellan project, fueled by the Company's unrealistically optimistic projections and ongoing omissions of its liabilities.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

58.   Following the June 18, 2013 disclosure of the multi-million dollar restructuring charges and loss of contracts, *The Motley Fool*, a financial website, published an article entitled "Why Tetra Tech Shares Tanked", drawing particular attention to the fact that "Management now sees a third-quarter loss of $0.30 to $0.50 per share on revenue of $440 million to $490 million, versus a prior view of a $0.32 to $0.42 *profit* on revenue of $525 million to $575 million." (emphasis in original).  The *Fool* noted that Tetra's conduct had the effect of "triggering plenty of concern over its profitability going forward[.]"  In particular, "analysts [we]re worried that the stock's premium earnings multiple w[ould] be challenged even further" in light of the disclosure.

59.   On August 9, 2013, the Company filed a quarterly report for the period ended June 30, 2013 on a Form 10-Q with the SEC (the "Q3 2013 10-Q") signed by, among others, the Individual Defendants.  Therein, Defendants explained in pertinent part:

> **The project charges that reduced revenue in the third quarter of fiscal 2013 primarily related to adverse developments on certain projects during the third quarter, and our subsequent evaluations and conclusions concerning the collectability of the related unbilled accounts receivable.  These charges included amounts related to claims, including requests for equitable adjustment, on three programs in the RCM segment with U.S. federal and state and local government clients.** In addition, we recorded a project-related charge on a commercial development contract in the TSS segment due to a change in client ownership and the related modification of plans for completion of the project.  **These events adversely affected the collectability of certain related**

**receivables and the profitability expectations for the project. Collectively, the project charges on these four programs reduced revenue and revenue, net of subcontractor costs, by $29.6 million in the third quarter of fiscal 2013.** [(Boldface added)]

60.    Tetra further admitted that "[w]e recognized losses of approximately $17 million related to the evaluation of collectability of claims during the third quarter and first nine months of fiscal 2013.  The losses were primarily related to contractual disputes with government clients."

## Accounting Standards

61.    GAAP unquestionably barred Tetra from recognizing its cost overruns as unbilled accounts receivable and required Tetra to reserve for losses.  Tetra violated both these principles.  Nevertheless, all of Tetra's periodic reports issued during the Class Period falsely represented that – other than expressly designated non-GAAP measures – Tetra had prepared its financial statements (including the accrual of accounts receivable and allowance for doubtful accounts) under U.S. GAAP rules and that the financial statements complied with U.S. GAAP rules.

62.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X also requires that interim financial statements comply with GAAP.   17 C.F.R. § 210.10-01 (a).   GAAP, as

described in Financial Accounting Standards Board ("FASB") Statement of Concepts No. 5 (FASB CON No. 5), provides the basic requirements for revenue to be recognizable: (i) revenue must have been earned; and (ii) revenue must be realizable (collectible) [*see also* ASC 605-10-25-1].

63.     SEC Staff Accounting Bulletin (SAB) Topic 13(A)(1) provides that revenue generally is realized or realizable and earned when <u>all</u> of the following criteria are met:

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectability is reasonably assured.

64.     Tetra's failure to properly account for uncertain-to-be-collected cost overruns violated GAAP.  Even if it was entitled to book the overruns as revenues, which it was not, Tetra did not account for doubtful accounts receivable in compliance with GAAP.  The GAAP standard for accounting for allowances for doubtful accounts receivable, as well as other loss contingencies, is set forth in the Financial Accounting Standards Board's Statement of Financial Accounting Standards ("FAS") 5.  Under paragraph 8 of FAS 5 [*see* ASC 450-20-25-2]:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: (a) information available prior to issuance of the financial statements that it is probable that an asset has been impaired or a liability has been incurred at the date of the

financial statements [and] (b) the amount of loss can be reasonably estimated.

65.     FAS 5, paragraph 22 [*see* ASC 310-10-35-9 and 10] specifies that losses from uncollectable receivables should be accrued when it is probable that the reporting entity will not be able to collect all accounts receivable when due, and can reasonably estimate the overall amount of losses.  It is not necessary that the reporting entity be able to identify the particular receivables that are uncollectible; under GAAP, "the allowance for doubtful accounts is fungible and applicable to the balance of receivables as a whole."  FAS 5, Paragraph 22 [*see* ASC 310-10-35-10].  FAS 5 identifies the following evidence as relevant to determining the amount to accrue: (a) experience of the enterprise or reference to the experience of other enterprises in the same business; (b) information about particular debtors' ability to pay (*i.e.*- credit reports, defaults, bankruptcy, financial statements); and (c) appraisal of the receivables in light of the current economic environment.  [*Id.*, ¶ 23.]

66.     Similarly, ARB No. 43, Chapter 11 Section B, which addresses government contracts subject to renegotiation, states that:

> In keeping with the established accounting principle that provision should be made in financial statements for all liabilities, including reasonable estimates for liabilities not accurately determinable, provision should be made for probable renegotiation refunds wherever the amount of such refunds can be reasonably estimated. *Thus, in cases where experience of the company or of comparable companies with renegotiation determinations is available and would make a reasonable estimate practicable, provision in the income account for an estimated refund affecting the current year's operations is called for. In cases in which a reasonable estimate cannot be*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

20

*made, as where the effect of a new or amended renegotiation act cannot be foretold within reasonable limits or where a company is facing renegotiation for the first time and no reliable precedent is available, disclosure of the inability, because of these circumstances, to determine renegotiation effects and of the consequent uncertainties in the financial statements is necessary.* [¶ 4 (Italics added)]

67.    48 CFR Chapter 16, Subpart 16.2, which governs Fixed-Price Contracts, provides that:

A fixed-price contract with prospective price redetermination may be used in acquisitions of quantity production or services for which it is possible to negotiate a fair and reasonable firm fixed price for an initial period, but not for subsequent periods of contract performance.

(a) The initial period should be the longest period for which it is possible to negotiate a fair and reasonable firm fixed price. Each subsequent pricing period should be at least 12 months.

(b) The contract may provide for a ceiling price based on evaluation of the uncertainties involved in performance and their possible cost impact. **This ceiling price should provide for assumption of a reasonable proportion of the risk by the contractor** and, once established, may be adjusted only by operation of contract clauses providing for equitable adjustment or other revision of the contract price under stated circumstances. [16.205-2] (Boldface added).

And:

This [fixed-price subject to prospective price redetermination] contract type shall not be used unless—

(a) Negotiations have established that (1) the conditions for use of a firm-fixed-price contract are not present (see 16.202-2), and (2) a fixed-price incentive contract would not be more appropriate;

(b) **The contractor's accounting system is adequate for price redetermination**;

(c) **The prospective pricing periods can be made to conform with operation of the contractor's accounting system**; and

(d) There is reasonable assurance that price redetermination actions will take place promptly at the specified time. [16.205-3] (Boldface added)]

68.    Finally, Tetra's internal Code of Business Conduct states that "Company records must reflect an accurate, complete and verifiable record of all transactions. No false or misleading entries may be made for any reason; and no employee may assist any other person in making such entries."

## Confidential Witnesses

### Accounting

69.    Confidential Witness ("CW") 1 worked in the Accounts Receivable Department of Tetra's Pasadena headquarters, for 16 years before retiring in June 2012. Prior to leaving the Company, CW1 reported to Ken Atkins, another manager in the Accounts Receivable Department.   CW1 was responsible for training new billing clerks, overseeing administration of the accounts receivable software system, and ensuring the smooth operation of the department.

70.    CW1 states that a majority of Tetra Tech's accounts receivable staff, which is responsible for the collection of payments from customers, is located in the Pasadena headquarters.   The billing clerks in headquarters were assigned to a specific geographic region.    However, many regions had their own, in-house accounts receivable staff.    When a regional office was responsible for collecting their own

accounts, accounts receivable managers at regional offices communicated frequently with managers at the Pasadena headquarters through email, to apprise them of their progress in collecting the accounts.

**Government**

71.   CW2 was a program analyst for Pro-Telligent, an Arlington, Virginia based company acquired by Tetra in August 2011, from 2005 to December 2012. During a seven-year tenure at Pro-Telligent, CW2 worked full-time for the U.S. State Department, providing program analysis and planning services on various programs. Several hundred Pro-Telligent employees were employed full-time as contractors for the State Department, providing a wide range of technical and consulting services.  The State Department paid Pro-Telligent Tech for the employee's services, and Pro-Telligent, in turn, paid their employees a percentage of this money in the form of a salary.

72.   According to CW2, in December of 2012, a large percentage of these employees, including CW2, had their contracts with the State Department terminated. CW2 stated that more than 100 contracts were terminated and represented a majority of the Pro-Telligent contractors employed by the department.  After their contracts with the State Department were terminated, these employees were fired by Pro-Telligent.

73.   CW2 attributed the firings to the fact that the State Department was required to make budget cuts. To reduce spending, the Department terminated many contracts with contractors employed by outside companies, including Pro-Telligent, as

these employees were considered less essential than employees of the State Department.  Nevertheless, despite the fact these budget cuts were public knowledge as early as Fall 2012, and even though CW2 raised direct questions about the looming cuts, CW2's superiors ignored her concerns and did not offer her a formal reply. "They knew," CW2 said. "They just didn't want to show it because then we [*i.e.,* State Department contractors employed by Pro-Telligent] might quit."

74.   CW3 was employed as Vice President of Federal Programs for Tetra Tech EC ("EC"), Tetra's subsidiary responsible for construction projects.  CW3 held this position from June 2004 to June 2013.  Based in Tetra Tech's San Antonio, Texas office, CW3 reported to Larry Brown, Tetra's Senior Vice President of Strategy and Development.  In turn, Brown reported to a line of executives leading directly to Defendant Batrack.  CW3 was responsible for developing new business contracts with federal agencies and working as a liaison with current federal clients.  CW3's responsibilities included both federal government proposal development and client relations.

75.   Among the large construction projects EC was working on in early 2013 were military projects in Afghanistan, military projects in the Southeastern United States and levee and floodwall construction in New Orleans, Louisiana.  Most of these projects were being undertaken in partnership with the Army Corps of Engineers.

76.     CW3 said that the majority of the projects being overseen by Tetra were "not performing well," and were "in bad shape," meaning that the cost of the project was exceeding the Company's estimates, reducing the amount of profit that Tetra expected to receive on the project.  CW3 considered the cumulative losses significant enough to contribute to a wave of firings in 2013.

77.     In a typical project, stated CW3, EC would be hired by a client to complete design and construction of a specified project for a pre-set rate.  CW3 explained that should the cost of the actual project run over the pre-set price bid by Tetra at the commencement of the project, most if not all of the subsequent cost overruns would be borne by Tetra.  If a project's cost exceeded a certain amount, Tetra would be required to complete construction of the project but would do so at a loss.  When a project faced a cost overrun, Tetra would relay a request for equitable adjustment to the client.

78.     CW3 stated that a number of construction projects with federal agencies had undergone requests for equitable adjustment, including some in Afghanistan, New Orleans and the Southeastern United States.

79.     CW3 also observed the Company's attempt to counteract losses due to cost overruns with layoffs, designed to remove expenses from the company's balance sheet.

80.     CW4 was a senior project controls engineer at EC from October 2006 to April 2013.  EC falls within the company's RCM segment, which covers construction

projects.  CW4 worked out of the company's Lakewood, Colorado, office and reported to Colin Cookney, vice president of construction, who in turn reported to John DeFeis, EC's Chief Operating Officer.

81.    CW4 was responsible for overseeing construction projects. His duties included reporting on the status of projects, which required monitoring the project's progress and costs, as well as ensuring the project was being constructed in accordance with design and contractual specifications.

82.    Among the projects CW4 oversaw was the construction of Camp Hadrian in Afghanistan, for which the U.S. Army Corps of Engineers subcontracted EC.   CW4 was also aware that Tetra was constructing a nearly identical facility at the U.S. military Camp Gereshk, as well as at least two other facilities about which he was less familiar.

83.    The construction of the camps was being led by the U.S. Army Corps of Engineers, for which EC had been contracted to perform certain aspects of the design, engineering and construction.

84.    In late 2012, CW4 became aware that construction at both Camp Hadrian and Camp Gereshk had fallen behind schedule. A third construction project in Afghanistan, also for a U.S. military installation, had fallen behind schedule as well.

85.    CW4 cites two primary reasons for falling behind the schedule:  First, the bases were isolated and it was difficult to get construction materials to them, as supply

convoys frequented fell under attack.   Second, subcontractors hired by EC to perform portions of the work were failing to meet their contractual obligations, causing construction to fall behind. EC employed a number of subcontractors, among the largest of which was the Al Sharaf Group, of Saudi Arabia.   "When [the subcontractors] failed, we failed," said CW4.

86.   CW4 stated that when a project fell behind schedule, it invariably increased costs to EC, due to contractual obligations, salaries, and other factors.   The Company's "burn rate"[1] in Afghanistan was sufficiently high that the longer the delay, the sharper the cost overruns.

87.   CW4 characterized the problems with the construction of the Afghanistan projects as first becoming apparent at the end of 2012 and within the first two months of 2013, but the actual delays and cost overruns likely began earlier. The cost overruns accelerated in the first and second quarters of 2013 and continued through CW4's departure from the Company in April 2013.

88.   CW4 stated that under EC's reporting structure, reports on the progress of all construction projects – including reports of cost overruns – were sent to senior management on a quarterly basis.  Tetra senior management would have known about the delays based on the weekly and quarterly reports they were provided.

---

[1] "Burn rate" is defined as "[t]he monthly rate at which a contractor's funds are expended during the period of the contract."
*See* https://dap.dau.mil/glossary/pages/1516.aspx.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

27

89.    By the time he left Tetra in April 2013, CW4 understood that the Camp Hadrian project alone had sustained at least $3 million in unexpected cost overruns.

90.    CW4 also stated that the Camp Gereshk project, which was nearly identical to the Camp Hadrian project and whose construction was delayed for similar reasons, was also facing an approximately $3 million cost overrun, and that a third project in Afghanistan was facing cost overruns as well.

91.    Corroborating CW3, CW4 stated that when a construction project incurred unexpected cost overruns, EC would often attempt to seek equitable adjustment to the contract.  Equitable adjustments were characterized by a period of negotiation in which Tetra would seek to have the client shoulder all or some of the costs that it did not foresee.  If the client refused, the cost overruns generally fell to EC to cover.

92.    CW4 further states that he reported the status of the Camp Hadrian project he oversaw as often as once a week.

93.    CW5 worked as a communications engineer for Tetra Tech AMT ("AMT"), an Arlington, Virginia-based subsidiary of Tetra, from November 2011 to March 2013.  AMT is a wholly owned subsidiary of Tetra and it is the aviation/aerospace management and information technology arm of the parent company.

94.    CW5 reported to Ram Rao, a senior communications engineer.  CW5 responsibilities centered around supervising the upgrade of telecommunications

infrastructure for the Federal Aviation Administration ("FAA"), AMT's largest client. CW5 worked in the company's headquarters in Arlington.

95.    According to CW 5, AMT's business model is based on acquiring new contracts and having existing, long-term contracts renewed.  In general, a long-term contract with a client would contain options for the client to renew the contract, often on a yearly basis.

96.    New federal contracts were usually acquired by responding to current Requests for Proposals ("RFPs") issued by a government agency in which it specified the service required.

97.    In 2012 and 2013, several AMT clients, including the FAA, declined to renew a number of long-term, multi-year contracts that they held with the Company.

98.    In addition, AMT failed to receive a number of new contracts that it had expected to obtain via responses to RFPs.  CW5 said these losses were common knowledge among employees within the Company.

99.    CW5 stated that the departure in early 2012 of Michael Murphy, a senior vice president, whom CW5 characterized as critical in acquiring and maintaining contracts, played a part in the losses of contracts in response to the RFPs.

100.    The loss of the FAA contracts represented a significant financial loss for AMT.  Long-term contracts could be worth hundreds of millions. In response to the losses, Tetra began laying off employees at the end of 2012.

101.   CW5 stated it was common knowledge among AMT employees that several contracts with the FAA had gone over budget.  These cost overruns caused the FAA and AMT to enter into equitable adjustment negotiations.

102.   According to CW5, AMT president Susan B. Chadokewitz ("Chadokewitz") received monthly status reports from her staff on the state of all projects, including those experiencing cost overruns, and visited FAA headquarters in Washington DC approximately every week.

**Commercial**

103.   CW6 worked at Tetra Tech GEO ("Geo"), a division of Tetra headquartered in Sterling, Virginia, specializing in environmental services and consulting, for 13 years, from 2000 to 2007.  CW6 worked in the division's human resources department coordinating employee benefit enrollment and, from 2007 to May 2013, in the accounts receivable department where she was charged with collecting payments from clients.  CW6 was the sole employee in the division tasked with collections, providing her direct contact with all of the division's clients, including General Electric ("GE"), Ford, and ExxonMobil, and an overview of the division's operations.

104.   According to CW6, in the beginning of 2013, Geo was employed by GE to perform work associated with the dredging of the Hudson River. The project employed many firms and is estimated to cost more than $500 million.  Geo had been under contract with GE for several years to assist with the project and had opened an

office in Schuylerville, New York, to help fulfill its contract.  The project with GE represented a "significant" portion of the division's business, at least 10% of the division's revenues.

105.  In approximately April 2013, Geo abruptly lost the contract with GE. CW6 stated that the contract expired naturally, but that GE had "kicked out" Tetra Tech.  "GE fired us," CW6 said.  Layoffs in the Tetra Tech Geo division began in April 2013, immediately after the loss of the contract.  Around the same time, the Company's office in Schuylerville was closed.  At least 10% of the division's 160 employees had been laid off by the time CW6 was fired in May 2013.   Employees in both Schuylerville and Sterling were let go.

**Canada**

106.  CW7 worked for Tetra from February 2011 to June 2013, in its Wardrop Engineering division ("Tetra/Wardrop").   Tetra/Wardrop specializes in resource management, energy, and infrastructure design.   Tetra acquired Wardrop Engineering, Inc. in January 2009, adding its 13 offices in Canada, the United Kingdom and India to the Company's ECS segment.  From February 2011 to February 2012, CW7 worked as a senior project specialist, and from February 2012 to June 2013, he worked as a project manager in Canada.

107.  Beginning in 2011, CW7 oversaw the operations of three projects, working out of Tetra's Thunder Bay, Ontario, Canada headquarters. In each of the

projects, CW7 provided engineering consulting services to Cameco, the world's largest publicly-traded uranium company.

108. CW7 states that Cameco hired Tetra/Wardrop to provide engineering consulting services at various projects, including the revitalization of the Key Lake uranium mill, the Rabbit Lake uranium mill, and the Cigar Lake uranium mine, all in Saskatchewan. In order to increase production rates, Cameco needed to upgrade its facilities. Tetra was hired as a long-term contractor on these projects. CW7 states that the amount of revenue paid to Tetra/Wardrop by Cameco annually was at least in the tens of millions.

109. CW7 reports that in the first quarter of 2013, Cameco was in the process of canceling its contracts with Tetra/Wardrop. Tetra/Wardrop's participation in two of the large projects came to an abrupt and unexpected end, and its participation in the third project declined. CW7 described the terminations as "very unexpected" and "devastating." Of the 400 employees assigned to Cameco-related projects, approximately 90% were terminated over the next three to four months. Tetra/Wardrop thus incurred sudden, large restructuring costs. CW7 said the executives in Tetra's headquarters were notified of the terminations "soon" after they started because Tetra's executives in the company's Pasadena headquarters received regular updates from Tetra/Wardrop managers.

110.   CW8 was hired by Tetra/Wardrop as the lead mechanical and piping engineer on Cameco's Key Lake mining project.   CW8 also worked as the lead mechanical and piping engineer on the expansion of Cameco's McArthur River uranium mine and on various projects for the Iron Ore Company of Canada, at Labrador City.   During the Class Period, CW8 was assigned to Tetra's Sudbury, Ontario, Canada office.

111.   CW8 was first employed by Tetra in March 2010, although he has not performed any work for the company since June 2013.  CW8 reported regularly to Fred Hillman, the lead project engineer, and Joseph Leung, Tetra/Wardrop's assistant director of engineering.

112.   When CW8 began working for Tetra/Wardrop in 2010, Cameco, its largest client, was seeking to expand its production of uranium. That same year, Cameco's CEO, Jerry Grandey, publicly stated his intention to double uranium production to meet an increased demand for nuclear fuel. To accomplish this, Cameco sought to expand the production of its largest mine, Cigar Lake.

113.   According to CW8, Cigar Lake was Cameco's "most important project" – and, by extension, Tetra/Wardrop's.

114.   By 2010, Cameco had hired Tetra/Wardrop to conduct the engineering work associated with Cigar Lake's expansion, as well as the expansion of several other

facilities, including the Key Lake processing facility, where ore mined at Cigar Lake was to be processed.

115. CW8 stated that beginning in mid-2012, Cameco began canceling Tetra/Wardrop's contracts. By the end of 2012, Cameco had canceled most of the "detail" work – the production of engineering designs – associated with its uranium mining projects.  Most of the man-hours billed to Cameco by Tetra/Wardrop went into producing engineering designs. The cancellations continued through the middle of 2013, when Tetra/Wardrop was left with little to no Cameco-related work. Tetra/Wardrop's CEO.

116.  According to CW8 (and corroborating CW7), Tetra/Wardrop began laying off staff assigned to Cameco projects beginning in the summer of 2012.  By the summer of 2013, Tetra/Wardrop had laid off nearly all of the 400 employees previously assigned to Cameco projects. Iron Ore Company of Canada also terminated some contracts with Tetra/Wardrop beginning in 2013, which led to further layoffs.

117.  CW8 states that by June 2013, Tetra/Wardrop had closed its downtown Toronto office and "virtually" closed its Mississauga and Pickering offices, leaving only a skeleton administrative staff.  By this time, Tetra/Wardrop had few, if any employees left in their mining division.  "I'm not sure they have a mining division anymore," CW8 said.

118.   Moreover, these contracts were exclusive, meaning that Tetra/Wardrop was the only engineering firm performing consulting work on these projects.

119.   CW8 stated that the cost of the contracts was in in the tens of millions of dollars.  Cameco accounted for the vast majority of Tetra/Wardrop's mining work and was Tetra/Wardrop's largest client. At least 400 Tetra/Wardrop employees were assigned exclusively to Cameco-related projects.

120.   After the cancellations began in summer 2012, CW8 states that it was common knowledge among Tetra/Wardrop employees that layoffs would follow and that its work with Cameco was coming to an end.

121.   Although the Company blamed the loss of the contracts on the cyclical nature of the mining industry, CW8 stated that the true reason for the canceled contracts was, in large part, due to mistakes on Tetra/Wardrop's part, leading to a loss of confidence by Cameco in Tetra/Wardrop's engineering ability.  Problems with the Cigar Lake project, in particular, had led to the mine being inadvertently flooded twice, causing major delays.

122.   CW8 described the project as "troubled," due in part to "incompetent" engineers hired by Tetra/Wardrop, and stated that the knowledge and experience of many of the engineers at Tetra/Wardrop was poor relative to other, comparably sized firms.

123.   CW9 was a communications and change management lead at Tetra's global mining practice[2] from January 2012 to October 2013.

124.   Many of the Company's mining operations were concentrated in Canada. CW9 was headquartered in Saskatoon, Saskatchewan, Canada and reported to Ian McCormack, the director of business operations for Tetra's global mining practice.

125.   CW9 was responsible for initiating and implementing internal communications between the groups – "trying to get different units to speak to each other" – to maximize operational efficiencies.

126.   CW9 reports that mining operations were considered part of Tetra's division and were headed by James R. Pagenkopf ("Pagenkopf"), who is an Executive President of Tetra.

127.   CW9 stated that beginning in 2012 and continuing into 2013, the global mining industry began suffering a sharp downturn in the construction of new mines, from which ore is harvested. According to CW9, the downturn had two components.

- First, junior mining companies had increased difficulties obtaining investments for their operations. Junior mining companies operate under a business model in which they identify new bodies of ore. After identifying a new potentially profitable body of ore, the junior mining company will generally sell the rights to the body to a larger mining company. Due in part to fluctuations of the price of various ores, investors began to view investment in these companies as overly risky, leading to cutbacks in financing.

---

[2] Instituted in March 2012, the mining practice group was responsible for coordinating the various components of Tetra's mining operations, which were spread across a number of different subsidiaries.

- Second, major mining companies, including Cameco, a major Tetra Tech client, [*see supra*], came under increased pressure from shareholders to post share price gains that kept pace with those of companies in other industries. To increase short-term profits, shareholders pressured mining companies to cut back on investment in major capital projects, such as the construction of new mines, and instead focus on maximizing the operational efficiency of existing mines.

128.   CW9 states that Tetra's mining operations were affected negatively in two ways by this downtown. First, junior mining companies had hired Tetra to conduct pre-feasibility and feasibility studies on new ore bodies. When these companies faced difficult in securing financing, they were unable to commission as much work from Tetra.

129.   Secondly, when major mining companies cut back on capital projects, Tetra received less work related to the design, engineering and construction of these projects.

130.   CW9 said that the Global Mining Practice group became aware that the industry slowdown was happening in the first months of 2013.

131.   "It was on the radar since the beginning of 2013," CW9 states. "The signs were there. … The writing was on the wall."

132.   CW9 states that all units of the company were responsible for providing quarterly updates on their current and prospective financial conditions to Tetra's CEO, Defendant Batrack.

133. Pagenkopf and Senior Vice President Brent Thompson ("Thompson") of Tetra/Wardrop communicated "regularly" with Defendant Batrack about the financial status of mining operations, CW9 said, adding that it was common knowledge at the company that Pagenkopt and Thompson were responsible for keeping the CEO informed.

### Materially False and Misleading
### Statements Issued During the Class Period

134. The Class Period begins after May 2, 2012, when the Company issued a press release announcing 2012 Second Quarter Results, and reported net revenue of $624.3 million, EBITDA of $49.2 million, operating income of $35.5 million and diluted earnings per share of $0.35 and forecasted diluted earnings per share of $0.42 to $0.45 for the third quarter of fiscal 2012.

135. On May 4, 2012 the Company filed a quarterly report for the period ended April 1, 2012 on a Form 10-Q (the "2012 Q2 10-Q") with the SEC signed by, among others, Batrack and Burdick and where it reiterated the Company's previously reported financial results and financial position. The 2012 Q2 10- Q further stated that:

> Billed accounts receivable represent amounts billed to clients that have not been collected. Unbilled accounts receivable represent revenue recognized but not yet billed pursuant to contract terms or billed after the period end date. Most of our unbilled receivables at April 1, 2012 are expected to be billed and collected within 12 months. Unbilled accounts receivable at April 1, 2012 and October 2, 2011 include approximately $21 million and $16 million, respectively, related to claims and requests for equitable adjustment on contracts that provide for price redetermination primarily with agencies of the U.S. federal government. These amounts are management's estimate of the most probable amount to be realized upon the

conclusion of the claims settlement process. We regularly evaluate these claim amounts and record appropriate charges to operating earnings when collection is not deemed to be probable.

136.   Defendants Batrack and Burdick each made additional certifications that were incorporated in the 2012 Q2 10-Q certifying that:

A.  the filing fully complied with the requirements of Section 13(a) and 15(d) of the Securities Exchange Act of 1934;

B.  each had reviewed the filing and determined that the filing did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading;

C.  the financial statements, and other financial information included in the filing, fairly presented in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing;

D.  Batrack and Burdick had designed or supervised the design of disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries is made known to them by others within those entities;

E.  Batrack and Burdick had designed internal controls over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with United States generally accepted accounting principles;

F.  Batrack and Burdick had evaluated the effectiveness of Tetra's disclosure controls and procedures and accurately presented the conclusions stated in the body of the report that the controls were effective.

G.  Batrack and Burdick had accurately disclosed in the filing any material change in the registrant's internal control over financial reporting that occurred during the most recent fiscal quarter; and

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

H.  Batrack and Burdick had disclosed to the audit committee all material deficiencies and signs of fraud.

137.   The statements Defendants made in the 2012 Q2 10-Q as specified in Paragraphs 134 to 136 above were materially false and misleading because: (a) Defendants had not implemented effective internal controls at Tetra to account for collectability of receivables; (b) Tetra falsely inflated revenues and used an unreliable estimate of future revenues in regard to unbilled receivables instead of properly accruing for losses as required under GAAP; (c) Tetra had materially underreserved its allowance for doubtful accounts; (d) the statements omitted that Tetra/Wardrop's most important engineering consulting services and mining client had begun cancelling contracts with the Company in conjunction with a global mining downturn and Tetra/Wardrop's shoddy work; and (e) the financial statements, and other financial information included in the filing, did not fairly present in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing.

138.   On August 1, 2012, the Company issued a press release announcing fiscal 2012 Third Quarter and Annual Results, and reported third quarter net revenue of $684.7 operating income of $46.3 million and diluted earnings per share of $0.45. In addition, the Company reported that its backlog was a record high $2.06 billion and cash generated from operations was $56.8 million. The Company forecasted fourth quarter fiscal 2012 diluted earnings per share of $0.45 to $0.50.

139.   On August 2, 2012, the Company held a conference call during which Defendant Batrack stated that:

> Our RCM segment continues to steadily increase their revenue and improve their performance. In fact, this past quarter, the operating margin within RCM more than doubled from the same quarter last year. And I'm very pleased with their performance, and that was all done organically. No acquisitions, nothing that was infused from the outside.

140.   At the same conference call, Defendant Burdick stated that "our accounts receivable increased about 4% or approximately $28 million to $697.2 million."

141.   On August 3, 2012 the Company filed a quarterly report for the period ended July 1, 2012 on a Form 10-Q (the "2012 Q3 10-Q") with the SEC signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position.  The 2012 Q310-Q   further stated that:

> Billed accounts receivable represent amounts billed to clients that have not been collected.  Unbilled accounts receivable represent revenue recognized but not yet billed pursuant to contract terms or billed after the period end date.  Most of our unbilled receivables at July 1, 2012 are expected to be billed and collected within 12 months.  Unbilled accounts receivable at July 1, 2012 and October 2, 2011 include approximately $25 million and $16 million, respectively, related to claims, and requests for equitable adjustment on contracts that provide for price redetermination primarily with the U.S. federal government agencies.  These amounts are management's estimate of the most probable amount to be realized upon the conclusion of the claims settlement process.  We regularly evaluate these claim amounts and record appropriate charges to operating earnings when collection is not deemed to be probable.

The 2012 Q3 10-Q contained certifications signed by Batrack and Burdick identical to ¶ 136 above.

142.   The statements Defendants made in the 2012 Q3 10-Q as specified in Paragraphs 138 to 141 above were materially false and misleading because: (a) Defendants had not implemented effective internal controls at Tetra to account for collectability of receivables; (b) Tetra falsely inflated revenues, particularly in the RCM segment, and used an unreliable estimate of future revenues in regard to unbilled receivables instead of properly accruing for losses as required under GAAP; (c) Tetra had materially underreserved its allowance for doubtful accounts; (d) the statements omitted that Tetra/Wardrop's most important engineering consulting services and mining client had begun cancelling contracts with the Company in conjunction with a global mining downturn and Tetra/Wardrop's shoddy work; and (e) the financial statements, and other financial information included in the filing, did not fairly present in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing.

143.   On November 7, 2012 the Company issued a press release on Form 8-K announcing fourth quarter and fiscal year results for period ending September 30, 2012 (the "2012 Q4 8-K").  For the fourth quarter, the Company reported revenues of $719.4 million, operating income of $48.5 million, diluted earnings per share of $0.47, a record high backlog of $2.14 billion and cash from operations of $29.8 million. For the fiscal year, the Company reported revenue of $2.71 billion, operating income of $166.4

million, diluted earnings per share of $1.63 and cash from operations of $158 million.

The 2012 Q4 8-K was signed by Defendant Batrack.

144.   In the November 7, 2012 press release:

Tetra Tech's Chairman and CEO, Dan Batrack commented, "Tetra Tech finished the year with a strong fourth quarter that resulted in 13% net revenue growth and 10% backlog growth. Based on net revenue, our international business is now the largest client sector and the fastest growth market, having grown 19% organically in the fourth quarter. Our record backlog, expansions into Brazil and oil & gas, and the realigned organization provide a solid foundation for continued growth in 2013."

145.   On November 8, 2012, the Company held a conference call during which Defendant Batrack stated that:

Our net revenue was $536 million for the quarter, which was an increase of 13% year-over-year. Our EBITDA, operating income and our diluted earnings per share for our shareholders were all up 12% year-over-year. And even with a very high revenue quarter that we had this last fourth quarter, we continued to add to our backlog, setting a new all-time record of $2.14 billion of funded and authorized work, which was up 10% year-over-year.

Batrack further stated that:

For the full year, we generated over $2.7 billion in revenue. Our net revenue was over $2 billion for the first time, which was up 13% from 2011, and net revenue is a very good indicator of the progress that we at Tetra Tech made this past year. It represents an increase in our headcount, more staff, more professionals, more internal capability. It means we have more clients, it means we have more contracts than ever before and based on our good project performance in all these contracts, it allowed us to grow our operating income and earnings per share even faster.

And: "Our federal work, it was also up slightly, just slightly up 2% year-over-year and it was supported by the book of orders that we'd already had in place and remains. This is a very stable client for us …"

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
43

146. The statements Defendants made in the 2012 Q4 8-K as specified in Paragraphs 143 to 145 above were materially false and misleading because: (a) Defendants had not implemented effective internal controls at Tetra to account for collectability of receivables; (b) Tetra falsely inflated revenues, did not mention that inflation in its explanation of Q4 2012 revenue, and used an unreliable estimate of future revenues in regard to unbilled receivables instead of properly accruing for losses as required under GAAP; (c) Tetra had materially underreserved its allowance for doubtful accounts; (d) the statements omitted that Tetra/Wardrop's most important engineering consulting services client had begun cancelling contracts with the Company in conjunction with a global mining downturn and Tetra/Wardrop's shoddy work; (e) the federal government was not a "very stable client" for Tetra as evidenced by the looming budget cuts set to adversely impact the Company's Pro-Telligent division; and (f) the financial statements, and other financial information included in the filing, did not fairly present in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing.

147. On November 15, 2012, the Company filed an annual report for the period ended September 30, 2012 on a Form 10-K with the SEC (the "2012 10-K") signed by, among others, the Individual Defendants and where it reiterated the Company's previously reported financial results and financial position. The 2012 10-K further stated that:

Billed accounts receivable represent amounts billed to clients that have not been collected. Unbilled accounts receivable represent revenue recognized but not yet billed pursuant to contract terms or billed after the period end date. Most of our unbilled receivables at September 30, 2012 are expected to be billed and collected within 12 months. Unbilled accounts receivable at September 30, 2012 and October 2, 2011, include approximately $21 million and $16 million, respectively, related to claims, and requests for equitable adjustment on contracts that provide for price redetermination primarily with U.S. federal government agencies. These amounts are management's estimate of the most probable amount to be realized upon the conclusion of the claims settlement process. We regularly evaluate these claim amounts and record appropriate adjustments to operating earnings when collection is deemed to have changed.

The 2012 10-K contained certifications signed by Batrack and Burdick identical to ¶ 136 above.

148. The statements Defendants made in the 2012 10-K as specified in Paragraph 147 above were materially false and misleading because: (a) Defendants had not implemented effective internal controls at Tetra to account for collectability of receivables; (b) Tetra falsely inflated revenues, did not mention that inflation in its explanation of Q4 revenue, and used an unreliable estimate of future revenues in regard to unbilled receivables instead of properly accruing for losses as required under GAAP; (c) Tetra had materially underreserved its allowance for doubtful accounts; (d) the statements omitted that Tetra/Wardrop's most important engineering consulting services and mining client had begun cancelling contracts with the Company in conjunction with a global mining downturn and Tetra/Wardrop's shoddy work; (e) the federal government was not a "very stable client" for Tetra as evidenced by the

looming budget cuts set to adversely impact the Company's Pro-Telligent division; and (f) the financial statements, and other financial information included in the filing, did not fairly present in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing.

149.   On January 30, 2013, the Company issued a press release reporting results for the first quarter of fiscal 2012.  The Company reported revenues of $658.5 million, operating income of $41.8 million, diluted earnings per share of $0.41 million, a backlog of $1.9 billion and cash from operations of $17.8 million. The Company also forecast the following:

> Tetra Tech expects diluted EPS for the second quarter of fiscal 2013 to be in the range of $0.38 to $0.42. Revenue, net of subcontractor costs, for the second quarter is expected to range from $500 million to $550 million. For fiscal 2013, Tetra Tech is increasing guidance for its diluted EPS and revenue, net of subcontractor costs. Fiscal 2013 EPS is now expected to range from $1.85 to $1.96. Revenue, net of subcontractor costs, for fiscal 2013 is expected to range from $2.15 billion to $2.35 billion.

150.   On January 31, 2013, the Company held a conference call during which Defendant Batrack stated that "RCM maintained its revenue during the quarter." Batrack further stated, in response to an analyst question about what gets you to the bottom range or the $500 million, and then what gets you to the top, the $550 million?" as follows:

> . . . . Really, it's the same 2 items. It's just depending on which way they swing for us. The bottom end would indicate a more accentuated delay at the federal level and also continued softness on mining, and maybe some

other economic areas that would represent softness on the commercial side, that would represent our performance at the lower end. And conversely, if we actually saw some type of clearance or some type of opening up on the federal work and rebounding on mining, there are a number proposals out there and many things that are pending moving forward. So if we actually saw those open up on mining and if we saw oil and gas just continue as it is, that would move us to the top end. In fact, it could move us through the top end.

151.   At the same conference call, Defendant Burdick stated that "Accounts receivable increased by about 1% to $674.9 million. Virtually, all of this increase is related to the change in our revenue mix, which is now weighted more towards commercial and international work."

152.   On February 1, 2013, the Company filed a quarterly report for the period ended December 30, 2012 on a Form 10-Q (the "Q1 2013 10-Q") with the SEC signed by, among others, the Individual Defendants, where it reiterated the Company's previously reported financial results and financial position.  The Q1 2013 10-Q further stated that:

> Billed accounts receivable represent amounts billed to clients that have not been collected.  Unbilled accounts receivable represent revenue recognized but not yet billed pursuant to contract terms or billed after the period end date.  Most of our unbilled receivables at December 30, 2012 are expected to be billed and collected within 12 months.  Unbilled accounts receivable at December 30, 2012 and September 30, 2012 include approximately $17 million and $21 million, respectively, related to claims, and requests for equitable adjustment on contracts that provide for price redetermination primarily with U.S. federal government agencies.  These amounts are management's estimate of the most probable amount to be realized upon the conclusion of claims settlement process.  We regularly evaluate these claim amounts and record appropriate adjustments to operating earnings when collection is deemed to have changed.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
47

The Q1 2013 10-Q contained certifications signed by Batrack and Burdick identical to ¶ 136 above.

153.   The statements Defendants made in the 2013 Q1 10-Q as specified in Paragraphs 149 to 152 above were materially false and misleading because: (a) Defendants had not implemented effective internal controls at Tetra to account for collectability of receivables; (b) Tetra falsely inflated revenues and used an unreliable estimate of future revenues in regard to unbilled receivables instead of properly accruing for losses as required under GAAP; (c) Virtually all of the increase in Tetra's net accounts receivable was <u>not</u> related to the change in our revenue mix, and also included cost overruns; (d) RCM did not "maintain its revenue", but was suffering lost profits due to rampant cost overruns; (e) Tetra stood to reach the bottom of its revenue projection not only because of government delay, but also its "burn rate" on its government contracts; (f) Tetra had materially underreserved its allowance for doubtful accounts; (g) the statements omitted that Tetra/Wardrop's most important engineering consulting services and mining client was in the process of cancelling contracts with the Company not only in conjunction with a global mining downturn but also due to Tetra/Wardrop's shoddy work; (h) the information contained in the filing did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (i) the financial statements, and other financial information included in the filing, did not fairly present in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing.

154.   On May 1, 2013, the Company issued a press release announcing fiscal 2013 Second Quarter Results, and reported net revenue of $642 million, EBITDA of $54.2 million, operating income of $37.7 million, diluted earnings per share of $0.38, a backlog of $2.03 billion and cash generated from operations of $44.3 million.

155.   In the May 1, 2013 press release:

> Tetra Tech's Chairman and CEO, Dan Batrack, commented, "We generated second quarter results that were in-line with our expectations and guidance. We continue to experience strong demand for our water and environmental services from commercial clients, especially with our oil & gas customers. U.S. commercial and international clients now represent 59% of our net revenue.

> As Tetra Tech previously announced, due to anticipated weakness in Eastern Canada and mining, Tetra Tech is updating its guidance for fiscal 2013. Tetra Tech expects diluted EPS for the third quarter of fiscal 2013 to be in the range of $0.32 to $0.42. Revenue, net of subcontractor costs, for the third quarter is expected to range from $525 million to $575 million. For fiscal 2013, Tetra Tech now expects diluted EPS to be $1.60 to $1.75. Revenue, net of subcontractor costs, for fiscal 2013 is now expected to range from $2.15 billion to $2.25 billion.

156.   On May 2, 2013, the Company held a conference call with investors to discuss the financial results of the prior quarter, and provide projections for future quarters. During the course of the conference call, Defendants Batrack and Burdick provided investors with a rosy picture of the company's financial health and near term revenues and income.  Defendant Burdick stated that:

> Overall, our second quarter results met our previous guidance that we had provided. Comparing the second quarter results,

this year to last year, revenue increased by about $18 million or 3% to $642 million, primarily as a result of an increase related to our oil and gas, and our commercial markets, both in the U.S. and abroad. The increase was partially offset by a slowdown in our federal government discretionary projects. Also, net revenue increased more significantly by about 9%, to $521 million. The net revenue results were within our guidance range that we had previously given also. I do want to point out that our net revenue is growing faster than our revenue because we're involved in more self-performance work, especially in our commercial and international client base, and the self-performance activity has benefited our bottom line. In fact, income from operations increased by about 6%, to $38 million, on a year-over-year basis. We did experience a strong growth rate in operating income, and as previously mentioned, our top line growth is coming from these U.S. and international commercial activities, led by oil and gas work, and these activities do have higher margins; thus, our operating income is increasing at a pretty good rate. Our second quarter income is higher in spite of increased severance cost and decreased utilization in our ECS group as Dan had mentioned a little bit earlier.

EBITDA also increased by about 10% to $54 million. This improvement resulted in EBITDA margin increasing to about 10.4%. This is better than the prior year for both the quarter and year-to-date. Our EBITDA increased at a higher rate compared to our operating income due to intangible amortization expense of about $2 million in the current quarter compared to last year.

\*\*\*

I would like to point out a few of the more significant balance sheet items. **As a result of our revenue growth that we had experienced, we thus have higher accounts receivable balances and higher accounts payable balances based on that growth in our business**. We did experience an increase in our net debt, and the primary driver for this was our recent acquisitions of both AEG and Parkland in the second quarter.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
50

Our net debt position was positively impacted by some very good cash flows in the quarter.

It says we've got -- speaking of the good cash flows on the -- if you're following on the webcast, you'll see that we generated $44.3 million of cash from operations in the quarter. This is about 34% more than the prior year quarter, and these improved results came from an increase in our EBITDA and better working capital. We expect that our operating cash flow for the year will still be about $150 million to $170 million for fiscal 2013, and this translates to cash generated, on a per-share basis, of about $2.31 to $2.62, which is quite a bit more than our EPS guidance.

***

Based on our performance in this past quarter, and evaluation of the current business trends and prospects, I've set our fiscal year 2013 Q3 and updated our full year guidance as follows: **For the third quarter, our guidance in revenue -- for net revenue is $525 million to $575 million with an associated diluted earnings per share of $0.32 to $0.42**. And I do recognize that this range is unusually wide for Tetra Tech, and the reason for that being wider in the second to third quarter is we expect to, on a prospective basis, make the reductions, the office closures, the back office reductions to mostly take place in the third quarter. In fact, our goal will be to it all complete and that's why we've left ourselves quite a wide range here.

For the year, fiscal year '13, our net revenue guidance range is from $2.15 billion to $2.25 billion, with an associated diluted earnings per share of $1.60 to $1.75. You do see that for the entire year, we expect approximately $36 million -- $0.36, I'm sorry, $0.36 impact from intangible amortization, $0.11 stock expense and overall effective tax rate of 34% for the second half of the year. And one thing I do want to note, because of the intangible amortization, there is a very large disconnect between our GAAP EPS and cash per share, and I do expect this, as you've seen on Steve's presentation, a cash per share of

1
2

somewhere between $2.31 and $2.62 per share. [(Boldface added)]

3   157.   In slides prepared for the conference call, the Company summarized its
4   projections for Q3 2013 as follows:

5
6
7
8
9

| Net Revenue | | Diluted EPS |
|---|---|---|
| Q3-13 | $525M - $575M | $0.32 - $0.42 |
| FY13 | $2.15B - $2.25B | $1.60 - $1.75 |

10
11   158.   The Company also claimed a 7% increase in revenue via accounts
12   receivable compared to Q2 2012.

13
14   159.   These strong projections for the Company's future growth caused Tetra's
15   share price to rise by $0.99 per share or almost 4%, to close on May 2, 2013 at $26.59.

16
17   160.   On May 3, 2013, the Company filed a quarterly report for the period ended
18   March 31, 2013 on a Form 10-Q with the SEC (the "Q2 2013 10-Q")  signed by,
19   among others, the Individual Defendants and where it reiterated the Company's
20   previously reported financial results and financial position.

21
22   161.   The Q2 2013 10-Q further stated that:

23   Billed accounts receivable represent amounts billed to clients that have not
24   been collected.  Unbilled accounts receivable represent revenue recognized
     but not yet billed pursuant to contract terms or billed after the period end
25   date.  Most of our unbilled receivables at March 31, 2013 are expected to be
26   billed and collected within 12 months.  Unbilled accounts receivable at
     March 31, 2013 and September 30, 2012 include approximately $36 million
27   and $21 million, respectively, related to claims and requests for equitable
28   adjustment on contracts that provide for price redetermination, primarily

with U.S. federal government agencies.  These amounts are management's estimate of the most probable amount to be realized upon the conclusion of the claims settlement process. We regularly evaluate these claim amounts and record appropriate adjustments to operating earnings when collectability is deemed to have changed.

The Q2 2013 10-Q contained certifications signed by Batrack and Burdick identical to ¶ 136 above.

162.  The statements Defendants made in the Q2 2013 10-Q as specified in Paragraph 154 to 161 above were materially false and misleading because: (a) Defendants had not implemented effective internal controls at Tetra to account for collectability of receivables; (b) Tetra falsely inflated revenues and used an unreliable estimate of future revenues in regard to unbilled receivables instead of properly accruing for losses as required under GAAP; (c) Tetra had materially underreserved its allowance for doubtful accounts; (d) Tetra's higher accounts receivable balances were not based on that growth, but on cost overruns; (e) Defendants' projections for Q-3 2013 were unreasonable in light of Tetra's overruns; (f) the statements omitted that Tetra/Wardrop's most important engineering consulting services and mining client had cancelled contracts with the Company in conjunction with a global mining downturn and Tetra/Wardrop's shoddy work, causing closures and layoffs, and forcing Tetra to incur restructuring costs; (g) the information contained in the filing did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (h) the financial statements, and other financial information included in

the filing, did not fairly present in all material respects the financial condition, results of operations and cash flows of Tetra for the periods presented in the filing.

163.   The statements referenced in ¶¶ 134 - 162 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including: (i) claims by customers and cost overruns created an acute risk that the Company would need to take an earnings charge; and, (ii) decreasing demand for the Company's services would lead to project closures.

## THE PARTIAL DISCLOSURES

164.   Between April and June 2013, the Company gradually revealed its true position through two partial disclosures to investors.   Both disclosures were accompanied by significant stock drops.

165.   On April 8, 2013, Tetra filed a press release on Form 8-K revealing that it anticipated weaker-than-expected operating performance during the second half of fiscal 2013, due primarily to its business in Eastern Canada.

166.   While the April 8 partial disclosure did not fully reveal the extent of the Company's misconduct, specifically with respect to massive restructuring costs associated with its Eastern Canadian and mining operations and cost overruns in its government contracts, Tetra's share price swooned, falling by approximately $1.47, from $28.36 to $26.89, a decline of over 5%, and then continuing to drop over subsequent days, finally reaching a low $24.44 on April 18, 2013.

167.   Then, on June 18, 2013, the Company issued a press release revising its prior guidance for the third quarter of 2013 to a loss of $0.30 to $0.50 per share.  The Company blamed the revision on an impairment charge of approximately $45 million due to "change orders on lump-sum projects for certain U.S. federal and state government customers" and $40 to $50 million in restructuring costs related to its Eastern Canadian operations.  The Company stated, in relevant part:

> Tetra Tech plans to incur restructuring costs associated with its Eastern Canadian and mining operations in the third quarter 2013. These costs are now estimated to be approximately $50 million in the third quarter, approximately $40 million of which are non-recurring. This increase is principally related to increased severance and office closure costs to downsize these operations due to reduced project demand caused by poor economic conditions. Approximately two-thirds of these costs are associated with Eastern Canada, and approximately one-third are associated with mining operations. Based upon these anticipated results, Tetra Tech is performing a goodwill impairment test on its Eastern Canadian and mining operations, and will update investors on the test results in the third quarter earnings release.
>
> In addition, Tetra Tech plans to incur charges to resolve certain project claims in its third quarter. During the quarter, Tetra Tech received adverse findings principally related to claims on four programs, and will consequently record a charge while it continues the dispute resolution processes. The claims are primarily related to change orders on lump-sum projects for certain U.S. federal and state government customers that are currently under significant budget pressure. These charges are estimated to be up to $45 million, most of which are associated with accounts receivable.
>
> The charges will affect the revenue and profitability of all three reportable segments. In the third quarter, revenue, net of subcontractor costs, is now expected to range from $440

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

million to $490 million, and, based on these charges, diluted loss per share is expected to range from $0.30 to $0.50.

168.   On this news, Tetra securities declined $3.55 per share or 13.26%, to close at $23.30 per share on June 19, 2013 on unusually high volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

169.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tetra securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

170.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tetra securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tetra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

172.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

173.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tetra;

- whether the Individual Defendants caused Tetra to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tetra securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

174. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

175. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Tetra securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Tetra securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

176.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## <u>COUNT I</u>

### (Against All Defendants For Violations of <u>Section 10(b) and Rule 10b-5 Promulgated Thereunder)</u>

177.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

178.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

179.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the

Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tetra securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tetra securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

180.  Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tetra securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tetra's finances and business prospects.

181.  By virtue of their positions at Tetra, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to

defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

182. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Tetra, the Individual Defendants had knowledge of the details of Tetra's internal affairs.

183. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tetra. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tetra's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tetra securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Tetra's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tetra securities at artificially inflated prices and relied upon the price of the

securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged upon disclosure of the truth.

184.   During the Class Period, Tetra securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tetra securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Tetra securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Tetra securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

185.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

186.   As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their

respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

187.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

188.   During the Class Period, the Individual Defendants participated in the operation and management of Tetra, and conducted and participated, directly and indirectly, in the conduct of Tetra's business affairs.  Because of their senior positions, they knew the adverse non-public information about Tetra's misstatement of income and expenses and false financial statements.

189.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tetra's financial condition and results of operations, and to correct promptly any public statements issued by Tetra which had become materially false or misleading.

190.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tetra disseminated in the marketplace during the Class Period concerning Tetra's results of operations.  Throughout the Class Period, the

Individual Defendants exercised their power and authority to cause Tetra to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Tetra within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tetra securities.

191.   Each of the Individual Defendants, therefore, acted as a controlling person of Tetra.  By reason of their senior management positions and/or being directors of Tetra, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tetra to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Tetra and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

192.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tetra.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:   October 30, 2013         **GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Peter A. Binkow
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

*Liaison Counsel for Plaintiff*

**POMERANTZ GROSSMAN HUFFORD**
**DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom (*Pro Hac Vice*)
Louis C. Ludwig
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

**POMERANTZ GROSSMAN HUFFORD**
**DAHLSTROM & GROSS LLP**
Jeremy A. Lieberman (*Pro Hac Vice*)
Lesley F. Portnoy (*Pro Hac Vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

*Lead Counsel for Plaintiff*

**BRONSTEIN GEWIRTZ &**
**GROSSMAN LLP**
Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296

*Additional Counsel for Plaintiff*

## PROOF OF SERVICE VIA EMAIL & U.S. MAIL

I, the undersigned, say:

I am a citizen of the United States and am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On October 30, 2013, I served the following document:

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

on counsel for the parties in this action, addressed as stated below:

Teodora E. Manolova
Goodwin Procter LLP
601 South Figueroa Street
41st Floor
Los Angeles, CA 90017
Telephone: (213) 426-2500
Facsimile: (213) 623-1673
Email: tmanolova@goodwinprocter.com

**By Electronic Mail**: By causing the document to be sent to each party via Electronic Mail at the electronic addresses listed on October 30, 2013; and

**By U.S. Mail**: By placing true and correct copies thereof in individual sealed envelopes, with postage thereon fully prepaid, which I deposited with my employer for collection and mailing by the United States Postal Service. I am readily familiar with my employer's practice for the collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, this correspondence would be deposited by my employer with the United States Postal Service that same day.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 30, 2013, at Los Angeles, California.

Harry H. Kharadjian